# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| JOHN M. HUDSON, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|   v. | )    **Case number 4:07cv1033 TCM** |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
|     Defendant. | ) |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405 (g) for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying John M. Hudson's 2001 applications for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, and supplemental security income ("SSI") under Title XV of the Act, 42 U.S.C. §§ 1381-1383b. Mr. Hudson ("Plaintiff") has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer. The case is before the undersigned for a final disposition pursuant to the written consent of the parties. See 28 U.S.C. § 636(c).

## Procedural History

Plaintiff applied for DIB and SSI in March 2001, alleging a disability onset date of April 14, 2000, caused by chronic back pain, pain in his right shoulder, multiple joint pain,

and numbness in his legs and feet.[1]  (R. at 63-65, 312-14.)[2]  His applications were denied initially and after a hearing held in February 2002 before Administrative Law Judge ("ALJ") Thomas C. Muldoon.  (Id. at 14-19, 27-39, 44-48, 316-21.)  The Appeals Council denied Plaintiff's request for review of that decision, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 4-5.)

Plaintiff then sought judicial review of the Commissioner's decision.  Hudson v. Barnhart, No. 4:02cv1286 TCM (E.D. Mo. March 16, 2004).  After the case was fully briefed, it was remanded on the grounds that the two Physical Residual Functional Capacity Assessments ("PRFCA") of Plaintiff, see pages 22 to 23, below, were completed by a disability examiner without the necessary input from a medical consultant.   (Id. at 346-78.) Following a supplemental hearing in March 2005 and the completion of a PRFCA by a physician, the ALJ held that Plaintiff retained the residual functional capacity for light work and was not disabled before March 17, 2002.[3]  (Id. at 333-38, 399-21.)  The Appeals Council denied Plaintiff's request for review.  (Id. at 322-24.)  This action followed.

_____

[1]In October 2000, Plaintiff filed applications for DIB and SSI based on a disability onset date of April 14, 2000.  (See Record at 60-66, 303-05.)  Plaintiff did not contest the initial denial of these applications.

[2]References to "R." are to the administrative record filed by the Commissioner with his answer.

[3]Plaintiff applied again for SSI and DIB on September 2002, alleging a disability beginning March 17, 2002 (the date of the ALJ's decision), caused by back pain.  (Id. at 389-93.)  These applications were granted following an administrative hearing.

## Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at both administrative hearings.

At the first hearing, Plaintiff testified he was born on April 24, 1958, and was then 43 years old.[4]  (Id. at 30.)  He was 5 feet 9 ½ inches tall and weighed approximately 236 pounds.  (Id.)  He had gained 40 pounds since he stopped working.  (Id.)  He lived with his parents.  (Id.)  He had two children, but neither lived with him.  (Id. at 31.)  Plaintiff completed the tenth grade in school and earned a General Equivalency Degree ("GED").  (Id.)  He can read, but has to reread things because pain causes him to lose concentration.  (Id. at 37.)  He was in the Army from 1977 to 1981.  (Id. at 31.)

Plaintiff last worked as a laborer.  (Id.)  He had to quit that job on April 14, 2000, when he hurt his lower back.  (Id.)  A worker's compensation claim for that injury was still pending.  (Id.)

Plaintiff testified that he was unable to work because he could not even breathe without pain.  (Id. at 32.)  He had pain in his lower back, right groin, and right leg.  (Id.)  Anything he did caused him pain.  (Id.)  Sitting or standing for longer than 10 to 15 minutes caused him pain.  (Id.)  Sitting at the table during the administrative hearing, Plaintiff was leaning on his elbow to help relieve the pain in his back.  (Id.)  He had to use a cane if he

---

[4]Much of the discussion of the record before the first §405(g) action is repeated from the Court's earlier Memorandum and Order.

walked farther than 100 feet.  (<u>Id.</u> at 33.)  Muscle spasms had caused him to fall "a couple of times."  (<u>Id.</u>)

Plaintiff further testified that the pain in his back was different than the pain in his right leg and groin.  (<u>Id.</u>)  The pain in his back felt like an ice pick jabbing in and out and a vise.  (<u>Id.</u>)  The pain in his groin felt like someone was kicking him.  (<u>Id.</u> at 34.)  The pain in his leg began as a sharp pain and ended in numbness.  (<u>Id.</u>)  All he could do to relieve any of the various pains was to recline in a chair or lie down in bed.  (<u>Id.</u>)

Plaintiff had been seeing Dr. Mahadevan for approximately a year.  (<u>Id.</u>)  Dr. Mahadevan had prescribed Lortab and Diazepam.  (<u>Id.</u>)  They reduced his pain "some."  (<u>Id.</u>)  He had no side effects from either medication.  (<u>Id.</u>)

Plaintiff testified that he no longer drove, having "lost" his vehicle a few years before. (<u>Id.</u> at 35.)  He did not think he could now drive because of his muscle spasms.  (<u>Id.</u>)  The spasms might cause him to unexpectedly step on the gas or slam on the brake.  (<u>Id.</u>)  He rarely visited friends or relatives.  (<u>Id.</u>)  He was not very sociable, finding it hard to relax or enjoy himself.  (<u>Id.</u> at 36.)  He did not attend church or any social clubs.  (<u>Id.</u>)  He did not engage in any outdoor activity.  (<u>Id.</u> at 37.)  Once or twice a month, he would cook; he never did the laundry or dusted; he seldom made his bed.  (<u>Id.</u> at 37-38.)  He had some difficulty with his personal grooming.  (<u>Id.</u> at 36.)  It scared him to have soap underneath his feet so he did not bathe but once or twice a week.  (<u>Id.</u>)  It was painful to put on his pants.  (<u>Id.</u>)  It took him about five or ten minutes to do so.  (<u>Id.</u> at 37.)  Muscle spasms and pain made it difficult for him to sleep.  (<u>Id.</u> at 38.)

Plaintiff, again represented by counsel, testified at the supplemental hearing that he lives in a house with his parents. (Id. at 410.) He stopped working in April 2000 after injuring his back at work. (Id. at 411.) He has not yet settled the resulting worker's compensation claim. (Id.)

Plaintiff had back surgery in September 2002 and again in April 2003. (Id. at 412.) Two pins were placed in his back in the first surgery. (Id.) Four screws, two rods, and some clips were placed in his back in the second surgery. (Id.) He had declined the surgery in 2000 when Dr. Mirkin told him he had a 50% chance his pain would be the same after the surgery and a 50% chance it would be worse. (Id.) The doctor who eventually performed the surgery, Dr. Gornet, told him he had a 90% recovery rate. (Id.) He is still recovering from the surgeries. (Id. at 413.)

He is currently being treated by Dr. Mahadevan, who has recommended against Plaintiff returning to work. (Id.) He has told Plaintiff that he might return to school in the future and, if able, take a part-time office job. (Id.)

Plaintiff further testified that he has been in pain since the day he was hurt. (Id.) The pain is in his lower back, groin, legs, and feet. (Id.) Since the surgery, his pain varies depending on the weather. (Id. at 414.) Before the surgery, any activity, e.g., taking a shower, walking, or sitting, increased his pain. (Id.) For instance, he could not sit for longer than thirty minutes or stand for longer than five or ten minutes. (Id. at 415-16.) He had to have help most of the time to get up from a sitting position. (Id. at 415.) His legs and groin

hurt every time he took a step.  (Id. at 416.)  Before the surgery, his pain was treated by a variety of medications.  (Id. at 414.)

Plaintiff uses a cane.  (Id. at 416.)  It has been a long time since he has driven.  (Id. at 416-17.)  He visits with friends or relatives five or six times a year.  (Id. at 417.)  He goes to church when he can, but has been able to only four times in the past five or six months.  (Id. at 417-18.)  He has trouble taking care of his personal grooming, including putting on his shoes, socks, underwear, and pants.  (Id. at 418.)  He tries to keep his room clean.  (Id.)  He can load the dishwasher, cook a meal occasionally, and go grocery shopping once a month if he has a cart and someone to help him put the groceries in it.  (Id.)

He has difficulty sleeping because muscle spasms wake him up.  (Id. at 419.)  Dr. Mahadevan started prescribing sleeping pills for him five months ago.  (Id.)  Plaintiff described his sleep between April 2000 and August 2002 as erratic.  (Id.)  He had no bedtime and slept when he could.  (Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed by Plaintiff as part of the application process; medical records; and medical evaluation reports.

As part of the application process, Plaintiff completed, in relevant part, disability reports, claimant questionnaires, and a work history report.

On a disability report, Plaintiff listed April 14, 2000, as the date when his impairments first bothered him and also as the date when they caused him to be unable to work.  (Id. at 80.)  When asked if he completed any special job training, trade or vocational school,

Plaintiff responded that he had completed "insurance agent school" in 1994. (Id. at 86.) According to his work history report, he sold insurance from 1992 to 1996. (Id. at 93.) He worked as a carpenter or laborer from 1985 to 1992 and from 1996 to 1999. (Id.) On another disability report, Plaintiff listed his disabling impairments as pain in his upper and lower back, right shoulder, and joints and as numbness in his legs and feet. (Id. at 113.) He cannot do anything repetitious or physical. (Id.)

In a claimant questionnaire, Plaintiff described the severity of his pain and his attempts to relieve it. (Id. at 100-03.) His symptoms – unbearable pain and constant numbness in his feet – were caused by standing, prolonged walking, sitting upright, and doing dishes or normal housework. (Id. at 100.) His pain detrimentally affected all his activities, including his personal grooming and filling out paperwork. (Id. at 101.) He had to have help putting on his shoes and socks. (Id.) If he went to the grocery store, he would use the cart as a walker. (Id.) His only hobby was maintaining his fish tanks, and it took him a long time to clean the tanks because of his pain. (Id. at 102.) He no longer had a valid driver's license, but he was trying to get a new one. (Id.) He seldom went out because he could not afford it. (Id.) He was living with his girlfriend, but he did not expect that to last. (Id. at 103.)

In a supplemental questionnaire, Plaintiff reported that he could sit for only three to five minutes and stand for ten to fifteen minutes before discomfort turned to pain. (Id. at 99.) He hated to bend or reach for fear of falling. (Id.) He also hated to climb stairs. (Id.) He could kneel or squat only if he could pull or push himself up. (Id.) In a later claimant

questionnaire, Plaintiff reported that he could not afford his prescription medications. (Id. at 126.) He was no longer living with his former fiancé and was living instead with his parents. (Id. at 127.) He had a valid driver's license. (Id. at 128.) His mother reported that Plaintiff had tried to help his father build a set of five steps but hurt for weeks afterward. (Id. at 129.)

An earnings record generated for Plaintiff for the years from 1972 to 2000, inclusive, listed no income in 1973, 1975, 1982, 1988, and 1995. (Id. at 69.) After his discharge from the Army in 1981, Plaintiff had annual earnings of less than $300.00 in two years and less than $5,000 in ten years. (Id.) In the remaining four years, he had annual income of $17,584.62 in 1993, $6,821.70 in 1997, $16,389.97 in 1999, and $7,824.23 for the three and one-half months he worked in 2000. (Id.) In the 19 years after his release from the Army, Plaintiff had 35 different employers. (Id. at 70-77.)

Plaintiff's medical records began with those of his treatment by Jay Mahadevan, M.D. (Id. at 142.) In October 1994, he first consulted Dr. Mahadevan for pain in his neck and head. (Id.) The pain had begun when a car in which Plaintiff had been riding hit a bump. (Id.) The diagnosis was neck and shoulder sprain. (Id.) The next office note is undated. (Id. at 143.) Plaintiff reported chronic low back pain and was prescribed Darvocet. (Id.) The next office note is dated September 27, 2000. (Id. at 144.) Plaintiff had "low back pain[;] bilateral sciatica." (Id.) He was prescribed Darvocet and Valium. (Id.) In April 2001, Plaintiff consulted Dr. Mahadevan about pain in his right testicle. (Id. at 295.) In June, Plaintiff reported that he was in severe back pain. (Id. at 296.) His walking was

impaired and he could not drive.  (Id.)  The diagnosis was severe pain; the treatment was Valium and Lortab, a combination of acetaminophen and hydrocodone. (Id.)  The following visit, in July, Dr. Mahadevan noted that Plaintiff was using a cane. (Id. at 297.)  Plaintiff's complaints were again of severe low back pain, the diagnosis and treatment were also the same as the month before. (Id.)  Plaintiff's complaints and Dr. Mahadevan's assessment and treatment were repeated in Plaintiff's monthly visits in August, September, October, November, and January 2002. (Id. at 298-302.)  It was also noted during these five visits that Plaintiff's pain was intractable. (Id.)  At the January 2002 visit, Plaintiff's gait was described as unsteady.  (Id. at 302.)

David Mullen, D.O., began treating Plaintiff after his April 2000 work-related injury. At Dr. Mullen's request, a computed tomography ("CT") scan of Plaintiff's lumbar spine was performed.  (Id. at 152.)  The results were negative with the exception of a moderate disc bulge at L4-L5.  (Id.)  Plaintiff attempted to work light-duty on April 18 and experienced severe low back pain and pain radiating from his groin down into his right leg. (Id. at 154.) The next week, Plaintiff telephoned to report that he had attended physical therapy the day before but was then in tremendous pain.  (Id.)  On May 1, Plaintiff reported feeling 60-80% better after physical therapy.  (Id.)  He was described as having an abnormal hip carriage. (Id.)  He was shown some low back stretching exercises.  (Id.)  Two days later, he reported feeling 75% better.  (Id. at 155.)  He was released to return to work.  (Id.)

On May 9, Plaintiff telephoned to report that he had gone back to work that morning for one hour.  (Id.)  The back pain was so severe he had to leave.  (Id.)  Two days later, he

reported that his back pain was no better. (Id.) Additional medications were prescribed. (Id. at 151, 155.) At the next, May 19 visit, Plaintiff was advised to remain off work. (Id. at 155.) On May 31, Plaintiff reported that he needed stronger pain medications or muscle relaxers. (Id.) Dr. Mullen doubled the Valium dosage. (Id.)

On June 12, Plaintiff said he was feeling "much better." (Id. at 156.) His range of motion was improved. (Id.) Proper body mechanics were discussed, and a work hardening program was to be considered. (Id.) The next day, Plaintiff requested a refill on the Valium prescription. (Id.) Dr. Mullen declined on the grounds that the refill was too early. (Id.) Plaintiff said he thought someone was taking his Valium. (Id.)

Plaintiff tried working again on June 27. (Id.) He was to sweep and empty trash, but had to stop because of back pain. (Id.) He was told to stop working until he finished the work hardening program. (Id.) As of July 12, however, Plaintiff was unable to start the work hardening. (Id. at 157.) He continued to have chronic back pain. (Id.) On July 26, Plaintiff reported that he had chronic back pain five out of seven days. (Id.) He was restricted from bending, stooping, squatting, or lifting any weights heavier than thirty-five pounds. (Id.) Two days later, Plaintiff telephoned to request stronger pain medication. (Id.) On August 7, Plaintiff consulted Dr. Mullen after having gone to the emergency room the week before. (Id.) Dr. Mullen recommended that Plaintiff walk two miles daily – eight laps around the school track – and put maximum effort into work hardening. (Id.) A few days later, Plaintiff was able to bend forward to within ten inches from the floor. (Id. at 158.) He

had no palpable spasms. (Id.) He was to continue the work hardening, but was released to return in four days to light work. (Id.)

Plaintiff called on August 22 to report that he had a lot of pain in his groin area and to request stronger pain medication. (Id.) Dr. Mullen told him to use the medication he had received two days before. (Id.) Plaintiff replied that he would find a personal physician to prescribe him the medication. (Id.) Three days later, however, Plaintiff returned to Dr. Mullen. (Id.) He reported no significant improvement in his back pain, and his range of movement was restricted. (Id.) Dr. Mullen concluded that Plaintiff had achieved his maximum medical recovery and recommended that he not perform laborer's work. (Id. at 158-59.) He was released from Dr. Mullen's care. (Id. at 159.)

Plaintiff began physical therapy at the Parkland Health Center on April 24, 2000. (Id. at 161.) The diagnosis was a moderate disc bulge at L4-L5. (Id.) He described his back pain as a four out of ten when sitting and an eight out of ten when lying down. (Id.) He could not stay on his feet or sit for any length of time. (Id.) His lumbar range of movement was 50% extension, 80% right side bend, and 70% left side bend. (Id.) His strength was within normal limits. (Id.) The plan was to see him daily for two weeks. (Id. at 162.) The goal was that he return to work in two weeks. (Id.)

Plaintiff appeared the next day for his first physical therapy session. (Id. at 163.) Ice was applied to his lower back for twelve minutes. (Id.) He had difficulty getting on and off the treatment table. (Id.) The session was discontinued. (Id.) The next day, Plaintiff reported having his best day so far. (Id.) Driving to the physical therapy session had been

his most activity that day.  (Id.)  He was instructed on stretches and was able to perform them without complaints, although his movements were described as "very jerky."  (Id.)  That type of movement was absent during his next session.  (Id. at 164.)  He was advised to try walking for about fifteen minutes that afternoon at a slow pace and with "good posture awareness."  (Id.)  He appeared to have improved posture and less pain.  (Id.)  He was to try some more exercises.  (Id.)

The next day, Plaintiff again reported having one of his best days yet.  (Id. at 165.)  He walked at home, but had an increase in pain.  (Id.)  He did not stretch prior to walking.  (Id.)  He was advised to try walking for seven to eight minutes, to stop if he felt pain, and to then try to stretch.  (Id.)  He was asked to walk on the treadmill, letting go of the handles after one minute, letting his arms swing, and maintaining good posture.  (Id.)  He stopped after three steps with his arms swinging, reporting a sharp pain in his right buttock.  (Id.)  The therapist opined that Plaintiff was improving, and noted that he had fewer reports of pain.  (Id.)

On May 1, Plaintiff reported that his pain had improved 60-70%.  (Id.)  He was taking frequent short walks without problems.  (Id.)  The therapist instructed Plaintiff in, and had him demonstrate, proper body mechanics and posture.  (Id. at 165-66.)  She reported to Dr. Mullen that Plaintiff's activity level continued to improve and that his transfers and ambulation were pain free.  (Id. at 182.)  The next day, Plaintiff said he felt a little better.  (Id. at 166.)  He was to walk on the track for ten minutes.  (Id.)  Riding an Airdyne bike for five minutes caused him pain in his right groin.  (Id.)  Two days later, Plaintiff tried a

recumbent bicycle and reported that it was more comfortable than the Airdyne. (Id. at 167.) Plaintiff described his right groin pain as a "softball size knot," but there was no mass felt on palpation. (Id.) Plaintiff reported soreness on palpation and was advised to apply a cold pack at home for ten minutes every two hours. (Id.)

The next day, on May 5, Plaintiff reported that his back pain was 90% better. (Id.) He did not walk the night before because of the pain. (Id.) After trying the recumbent bike, Plaintiff reported groin pain. (Id. at 168.) The therapist noted that his right groin pain and right hip abductor pain did not appear to be improving. (Id.) Dr. Mullen ordered that the physical therapy continue daily for ten days. (Id.) The therapist wrote Dr. Mullen on May 8 that Plaintiff was "independent with a home exercise program, but report[ed] only occasionally performing it." (Id. at 183.)

On May 10, Plaintiff was doing well at treatment. (Id. at 169.) The next day, however, he reported having extreme pain after mowing and trimming his lawn. (Id.) He had difficulty transferring on and off the treatment table. (Id.) He was advised to do only the stretches and walking. (Id. at 170.) He apparently was having difficulty getting enough rest because of his responsibilities at home. (Id.) His back pain was better the next day. (Id.) Plaintiff missed the next appointment because he was sick. (Id.) The next day, he explained that a call had been made to report that he was too sore to drive to his appointment. (Id.) His truck was going to be repossessed. (Id.) Plaintiff was told to keep his physical therapy appointments regardless of his circumstances so that his condition could be documented. (Id. at 171.)

Plaintiff reported on May 17 that he had had to break up his home workouts throughout the day because the pain was getting too bad. (Id.) He further reported that he could do anything on his feet for about thirty minutes before having to stop. (Id.) It was noted that he appeared to perform better than he reported. (Id.) On May 18, Plaintiff was able to lift a twenty-pound box from the floor to a waist-high table using proper body mechanics. (Id. at 172.) His posture and body mechanics were good. (Id.) He was to resume weight training the next day. (Id.) He was one hour and forty-five minutes late that day. (Id.) Again it was noted that there was an inconsistency between his reports of his home exercise program and his performance at the clinic. (Id.) That same day, his therapist informed Dr. Mullen that Plaintiff reported taking four types of pain medication before therapy each day and being in pain the rest of the day after therapy. (Id. at 184.) His upper and lower body strength were in normal limits without complaints of pain. (Id.) His lumbar range of movement was within normal limits with inconsistent complaints of pain. (Id.) Plaintiff did not appear for or call about his next appointment. (Id. at 172.) At the next scheduled appointment, he appeared two hours late. (Id. at 173.) He had no money for gas or a phone call. (Id.) He had been walking and doing his stretching exercises at home, and his pain had decreased enough that he had taken only three pills since his last session. (Id.) Plaintiff reported that he only wanted to do the resistive exercises until he felt the "knot" in his groin tighten up, but the therapist noted that this strategy – to do minimal effort – interfered with treatment. (Id.)

Plaintiff was forty minutes late for his next appointment. (Id. at 174.) The therapist told him he could walk and do some "cardio" exercises, but the therapist did not have the time to do a treatment based on the length of that treatment and other patients scheduled to arrive within fifteen minutes. (Id.) Plaintiff explained that severe weather kept him from being on time. (Id.) The therapist noted that she had driven through the area where Plaintiff lived and there was only heavy rain at the relevant time. (Id.)

The next day, Plaintiff appeared for his session complaining of getting little sleep at night. (Id.) He reported that his abdominal pain was not as bad as before and that his doctor linked the abdominal pain to his low back pain. (Id.) He was given a "T-Band" and exercises to do with it at home. (Id. at 175.) He reported the next day that he performed the stretches but not the "T-Band" exercises. (Id.) Plaintiff reported four days later that he was able to perform his home exercise program 90% of the time. (Id.) He appeared to be making minimal improvement in his range of movement but was increasing his tolerance for physical therapy. (Id. at 176.) The therapist wrote Dr. Mullen the same day to report that Plaintiff was tolerating more activity with inconsistent complaints of pain and with a need for constant one-on-one supervision for him to stay on task. (Id. at 185.) Moreover, he would often stop activities in the clinic with reports of spasms or muscle knots that could not be palpated by the therapist. (Id.)

On May 31, Plaintiff had a renewed prescription for additional physical therapy sessions and reported that his doctor was pleased with his results. (Id. at 176.) He was instructed to start on the weight machines and to stretch to relieve his pain. (Id. at 177.) He

grimaced and was tearful when changing positions from standing to prone. (Id.) On June 1, Plaintiff reported that he had gone to the city pool the day before and had leaned on the pool's side for a few hours. (Id.) His doctor had prescribed a new medication, but Plaintiff had not yet picked it up. (Id.) He appeared to be feeling better. (Id.)

Plaintiff was late for his next session. (Id. at 178.) He was still feeling better. (Id.) The therapist noted that Plaintiff appeared to be progressing well despite all the stress he had from family problems. (Id.) Plaintiff did not keep his next appointment; he called six hours later to report he would not be there. (Id.) He explained his absence the next day by relating that a close friend had died. (Id.) He was able to do his home exercise program. (Id.) The next day, he walked into the clinic in a "very guarded posture." (Id. at 179.) He had helped to care for a friend's seven-month child the day before and had carried the child a few times. (Id.) He had taken two pain pills that morning. (Id.) He was told to try his home exercise program and walking that day. (Id.) There was no change in his gait as he left the clinic. (Id.)

On June 8, Plaintiff reported feeling better. (Id.) He rated his lumbar pain as a four to five on a ten-point scale. (Id.) He appeared to be trying harder to get through the physical therapy session. (Id. at 180.) The next day, Plaintiff said he was anxious to return to work. (Id.) He performed all the resistance exercises well. (Id.) On June 12, the therapist reported to Dr. Mullen that Plaintiff was tolerating up to thirty minutes of aerobic activity and was demonstrating improved body mechanics when lifting. (Id. at 186.) His lumbar range of

movement remained unchanged.  (Id.)  On June 21, Plaintiff was transferred to a work hardening program.  (Id. at 181.)

At Dr. Mullen's request, Plaintiff was evaluated for such a program on October 9, 2000, at the Work Center, Inc.  (Id. at 224-45.)  Plaintiff complained of constant pain in his buttocks and lower back, numbness in his feet and upper right leg, and shooting pain in his groin and upper back.  (Id. at 224.)  Each type of pain was a six on a ten-point scale.  (Id.) The evaluator, Timothy J. Seals, MS, OTR/L (occupational therapist, registered, licensed) reported the following observations.

> Inconsistencies were noted during functional performance versus subjective reports.  Mr. Hudson continually terminated tasks, prior to any expected objective changes (heart rate increases, change in body mechanics, perspiration, facial grimacing, etc.) which would indicate exertion/effort. Affect was out of proportion with subjective reports.  Despite reporting significantly high levels of pain, Mr. Hudson's affect remained pleasant often smiling and joking.  Mr. Hudson declined the opportunity to take rest breaks between tasks or in order to complete tasks prior to terminating the evaluation, due to subjective complaints of pain and anticipated pain.  Mr. Hudson exhibited no change in posture or gait, and was observed to drive away from the Work Center inc. [sic] with a female companion in the passenger seat.

(Id. at 225.)  Mr. Seals concluded that an accurate assessment of Plaintiff's true functional level was not obtained during the evaluation, "based on a consistently limited effort during testing and inconsistencies noted between subjective reports and functional performance." (Id.)  Plaintiff's "years employed" was listed as one.  (Id. at 226.)  The perceived difficulties in him returning to work were lifting; functional postural demands of the job; carrying; and using large power or pneumatic tools.  (Id.)  It was noted on the bilateral carrying task that Plaintiff displayed good symmetry while carrying a twenty-five pound crate, contrary to his

- 17 -

report of twenty pounds being the maximum he could lift during the lifting task. (<u>Id.</u> at 229.)
On a low back pain questionnaire completed as part of the evaluation, Plaintiff reported that
pain killers gave him very little relief, it was painful to him to look after himself, he could
lift only very light weights, he could not walk farther than 1.2 miles, he could not sit longer
than ten minutes, he could not stand longer than thirty minutes, he could not sleep longer
than four hours regardless whether he took sleeping tablets, his sex life was "nearly absent"
because of the pain, and pain had restricted his social life to his home and any journey to less
than one hour. (<u>Id.</u> at 234.) His disability profile rating was "crippled." (<u>Id.</u>)

After the physical therapy sessions ended and before the work hardening program
evaluation, Plaintiff went to the emergency room at Parkland Health Center several times.
The first included visit was on August 3, 2000, for complaints of low back pain. (<u>Id.</u> at 201-
06.) He reported that his medications had been stolen. (<u>Id.</u> at 202.) The medications
included Darvocet, OxyContin, Valium, and Vioxx. (<u>Id.</u> at 203.) He was injected with a
muscle relaxant and reported improvement two minutes later. (<u>Id.</u> at 203-04.) He was
discharged within an hour of being examined. (<u>Id.</u> at 205-06.)

Five days later, on a Tuesday, he returned to the emergency room with a sharp
headache of three months duration. (<u>Id.</u> at 208.) His gait favored his right side. (<u>Id.</u> at 209.)
He had taken a pain pill the day before from a prescription filled on August 3. (<u>Id.</u> at 211.)
He reported that he was out of the pain pills recently prescribed. (<u>Id.</u>) He was discharged
within the hour. (<u>Id.</u>) On August 22, Plaintiff went to the emergency room with complaints
of pain in his right groin. (<u>Id.</u> at 214-23.) He had one pill of Norflex, a muscle relaxant, left.

(Id. at 214.)  His weight was 218 pounds and he smoked one pack of cigarettes a day.  (Id.)

Plaintiff was given a prescription for an antibiotic and a pain medication, Vicodin.  (Id. at

 221.)

Plaintiff's medical records before the ALJ also included those of R. Peter Mirkin,

M.D., who had evaluated Plaintiff pursuant to his worker's compensation claim.  (Id. at 194-

99.)  Dr. Mirkin first saw Plaintiff on June 21, 2000.  (Id. at 194.)  Plaintiff's chief complaint

was low back pain.  (Id.)  He was a smoker.  (Id.)  He walked with a mild antalgic gait and

had a 50% range of motion in his lumbar spine.  (Id.)  He could heel and toe walk, but could

not squat or rise from a squat position.  (Id.)  An X-ray and CT scan revealed some

degenerative disc disease changes at L4-L5.  (Id.)  There was no other distinct abnormality.

(Id.)  Dr. Mirkin recommended a magnetic resonance imaging ("MRI") scan.  (Id. at 195.)

One was performed, and revealed degenerative changes at L4-L5 without any nerve root

impingement.  (Id. at 196, 199.)  He found no indication that surgery was necessary.  (Id. at

196.)  Dr. Mirkin saw Plaintiff again in November.  (Id. at 197.)  He described Plaintiff as

an obese male who walked with a nonantalgic gait.  (Id.)  His range of motion in his lumbar

spine was 40% of normal.  (Id.)  He would not attempt a squat.  (Id.)  Dr. Mirkin

recommended that Plaintiff be restricted to a forty-pound permanent lifting restriction.  (Id.)

Also in November, Plaintiff was examined by Matthew F. Gornet, M.D., a spine

specialist, at Dr. Mahadevan's request.  (Id. at 256-57.)  Dr. Gornet noted that Plaintiff

smoked one pack of cigarettes a day and worked as a laborer.  (Id. at 256.)  His medications

were Darvocet and Valium.  (Id.)  On examination, he was able to bend and forward flex

with his hands only to his mid-thigh, returning to an upright position slowly.  (Id.)  Sensation was decreased in the L5 dermatone.  (Id.)  After reviewing x-rays and an MRI of Plaintiff's spine, Dr. Gornet concluded that he suffered from a disc injury at L4-L5 and had classic symptoms of discogenic low back pain and leg pain.  (Id. at 257.)  A few months later, in January 2001, Plaintiff returned to Dr. Gornet for a follow-up visit.  (Id. at 258.)  Dr. Gornet then recommended an anterior L4-L5 fusion based on the failure of conservative measures to relieve Plaintiff's pain.  (Id.)  Dr. Gornet's recommendation was forwarded by the worker's compensation insurance carrier to Dr. Mirkin.  (Id. at 198.)  Dr. Mirkin described the proposed surgery as "drastic" and reported that the results of such surgery were "not particularly great."  (Id.)  He also noted that Plaintiff had stated the previous November that he would not consider any invasive procedure.  (Id.)  He repeated his recommendation that Plaintiff attempt to find employment under his earlier-outlined restrictions and further opined that Plaintiff's degenerative disc disease was not caused by a work-related injury but was of long-standing duration.  (Id.)

In June 2001, Plaintiff was examined by Anthony H. Guarino, M.D., a pain specialist, in connection with his worker's compensation claim.  (Id. at 287-90.)  Michael Chabot, M.D., had evaluated Plaintiff the month before and recommended a discogram to clarify Plaintiff's source of pain.  (Id. at 287.)  Plaintiff reported back pain radiating into his groin and occasionally into his right lower extremities.  (Id.)  The pain was a ten out of ten at its worse and an eight out of ten at its best.  (Id.)  Plaintiff's current medication was only over-the-counter ibuprofen.  (Id.)  Plaintiff also reported that he had been using a cane for the past

month in an attempt to keep his weight off his right lower extremity. (Id.) He had an antalgic gait and was unable to walk heel and toe or to squat. (Id. at 288.) On palpation, the lumbar paravertebral muscles exhibited spasms, but there were no trigger points or tenderness over the lumbar vertebrae. (Id.) He had normal muscle tone in his lower and upper extremities. (Id.) After performing the discogram, Dr. Guarino reported that all sites that had been injected "produced a high level of pain when provoked." (Id. at 289-90.) Dr. Guarino opined as follows:

> This patient has a degenerative process in his back with pain report and behavior that appears to be way out of proportion to the existing anatomy. The discogram was unable to clearly identify one site as being a major source of his pain. It is my opinion that this patient would never benefit from any intervention. In review of his notes, it has been shown that he has excessive amounts of pain behavior as well as inconsistency when performing a functional capacity evaluation. I feel his issues of secondary gain need to be addressed first and then conservative care with some medications, physical therapy, and psychological support be persued [sic].

(Id.)

Dr. Chabot reevaluated Plaintiff nine days later. (Id. at 291.) He then recommended that Plaintiff undergo a psychiatric evaluation, consider the use of a transcutaneous electrical nerve stimulation ("TENS") unit for pain management, and also consider vocational rehabilitation. (Id.) Dr. Chabot considered it "unlikely" that Plaintiff would be able to perform his prior work duties. (Id.)

In addition to the records of Plaintiff's medical treatment, the ALJ had before him a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" completed by Dr. Mahadevan in February 2002. (Id. at 292-94.) Dr. Mahadevan reported that Plaintiff

could carry five to ten pounds at the most, could sit in one position for only five to ten minutes, could not push or pull, and could never balance, stoop, kneel, or crawl. (Id. at 292-93.) Dr. Mahadevan also noted that Plaintiff had a hearing loss in both ears, although he did not specify the degree of loss. (Id. at 294.) He opined that Plaintiff should be considered permanently disabled. (Id.) This opinion echoes the one expressed by Dr. Mahadevan in a noted dated October 25, 2001: "[Plaintiff] is currently under my care. He is permanently disabled from any gainful employment." (Id. at 284, 286.)

The ALJ also had before him a PRFCA completed by Rachelle Teaque, a disability examiner for the Social Security Administration, in November 2000 and a second Assessment completed by her in April 2001. The first Assessment listed the diagnoses as degenerative disc disease at L4-L5 and lumbar sprain. (Id. at 246.) After reviewing the medical opinions of Drs. Mullen and Mirkin and the medical records of Dr. Mirkin and the Work Center, Ms. Teaque assessed Plaintiff's exertional limitations as being able to only occasionally lift fifty pounds, frequently lift twenty-five pounds, and sit, stand, or walk six hours in an eight-hour work day. (Id. at 247.) His ability to push or pull was unlimited. (Id.) He was limited, however, in his ability to climb, balance, stoop, kneel, crouch, or crawl. (Id. at 248.) He had no manipulative, visual, or communicative limitations. (Id. at 249-50.) He should avoid concentrated exposure to vibrations. (Id. at 251.)

Five months later, in April 2001, Ms. Teaque again assessed Plaintiff's physical residual functional capacity ("RFC"). (Id. at 276-83.) She lowered the amount of weight he could carry to twenty pounds occasionally and ten pounds frequently. (Id. at 277.) Her

assessment of his ability to sit, stand, walk, push, and pull remained unchanged. (Id.) He still had no manipulative, visual, or communicative limitations and was still to avoid concentrated exposure to vibrations. (Id. at 279-80.) And, he remained limited in his ability to climb, balance, stoop, kneel, crouch, or crawl. (Id. at 278.)

Also in April 2001, James Spence, Ph.D., completed a "Psychiatric Review Technique" form, concluding that Plaintiff had no medically determinable mental impairment. (Id. at 261-75.)

On remand, Harold D. Ridings, M.D., completed a PRFCA of Plaintiff in December 2004, addressing the question of Plaintiff's RFC from April 2000 to March 17, 2002. (Id. at 399-406.) The primary diagnoses were degenerative disc disease and degenerative joint disease of the lumbar spine. (Id. at 399.) Dr. Ridings concluded that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, and could stand, sit, or walk for six hours in an eight-hour workday. (Id. at 400.) Plaintiff had an unlimited ability to push or pull. (Id.) He was frequently limited in his abilities to climb ramps and stairs, balance, kneel, and crawl. (Id. at 401.) He was occasionally limited in his abilities to stoop, crouch, and climb ladders, ropes, and scaffolds. (Id.) He had no manipulative, visual, or communicative limitations. (Id. at 402-03.) He had one environmental limitation: he should avoid exposure to vibrations. (Id. at 403.)

## The ALJ's Decisions

In his first decision, the ALJ concluded that Plaintiff had severe impairments of discogenic and degenerative disorders of the back and could not perform his past relevant

work.  (Id. at 15, 18.)  But, Plaintiff did have the RFC to occasionally lift at least twenty pounds, to frequently lift ten pounds, and to sit, stand, and walk throughout a normal work day.  (Id. at 18.)  He could, therefore, perform the full range of light work.  (Id.)  Applying the Medical-Vocational Guidelines, the ALJ concluded that, "[b]ased on an exertional capacity for light work, and the [Plaintiff's] age, education, and work experience," Plaintiff was not disabled within the meaning of the Act.

In reaching this conclusion, the ALJ considered and rejected the opinion of Dr. Mahadevan that Plaintiff was permanently disabled.  (Id. at 16.)  He noted that Dr. Mahadevan was a general practitioner and that his opinion conflicted with that of specialists. (Id.)  The ALJ further noted that Dr. Mahadevan's opinion was not supported by any significant objective findings.  (Id.)  The ALJ also rejected Plaintiff's description of disabling restrictions.  (Id.)  In finding Plaintiff's subjective complaints to be incredible and exaggerated, the ALJ considered the lack of objective findings to support the complaints and Plaintiff's sporadic work history.  (Id. at 16-17.)  Moreover, the ALJ noted that Plaintiff "outwardly complain[ed] of pain at the hearing but show[ed] no such outward signs of pain when conferring with his attorney or coming and going from the hearing."  (Id. at 17.)

In his decision following the remand, the ALJ noted that Plaintiff had again applied for DIB and SSI in September 2002, alleging a disability onset date that was the same date as the ALJ's first decision.  (Id. at 334.)  The ALJ also noted that, following a hearing, these applications were granted after the presiding ALJ found that Plaintiff's back condition had worsened after March 17, 2002.  (Id. at 334-35.)

Observing that this Court's prior order found no error in the ALJ's rejection of Dr. Mahadevan's medical opinions as controlling, in his evaluation of Plaintiff's subjective complaints, or in his decision not to elicit testimony by a vocational expert, the ALJ incorporated by reference his prior decision and declined to reopen the other ALJ's determination that Plaintiff was disabled as of March 17, 2002. (Id.) Instead, the ALJ summarized Plaintiff's testimony at the second hearing and the newly-submitted medical evidence. The testimony was a "more or less" a repetition of Plaintiff's earlier allegations. (Id.) The new evidence was Dr. Ridings's PRFCA. (Id. at 336.) This assessment found the same limitations found by Ms. Teaque in April 2001. (Id.) The ALJ's independent assessment of Plaintiff's RFC, based on the evaluation of the medical and other evidence, was that he had the RFC "to perform the physical exertional and nonexertional requirements of work except for lifting or carrying more than 10 pounds frequently or more than 20 pounds occasionally; doing more than occasional climbing of ropes, ladders or scaffolds, or of stooping or crawling; or having concentrated or excessive exposure to vibrations." (Id. at 336, 337.) This RFC did not significantly compromise Plaintiff's ability to do the full range of light work.[5] (Id. at 337.) Consequently, he was not disabled within the meaning of the Act. (Id. at 338.)

**Legal Standards**

---

[5]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b).

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920. "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities . . . ." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on h[is] ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed

in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)). Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence. **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000). Some medical evidence must be included in the record to support an ALJ's RFC holding. **Id.** at 867. "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez v. Barnhart**, 292 F.3d 576, 580-81 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing <u>Polaski</u>, 739 F.2d at 1322). Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." **Id.** <u>See</u> also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent."). After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

Also at step four, after an ALJ has assessed a claimant's RFC the ALJ will then "find that a claimant is not disabled if he retains the RFC to perform" the functional demands and job duties of his past relevant work as he actually performed them or as they are "generally required by employers throughout the national economy." **Wagner v. Astrue**, 499 F.3d 842,

853 (8th Cir. 2007).  An "ALJ may elicit testimony from a [VE] in evaluating a claimant's capacity to perform past relevant work."  **Id.**

The burden at step four remains with the claimant.  **Steed v. Astrue**, 524 F.3d 872, 876 (8th Cir. 2008); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451.

If, as in the instant case, the ALJ holds that a claimant cannot return to past relevant work, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  "If [a claimant's] impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment."  **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001).  "However, when a claimant is limited by a nonexertional impairment . . . the Commissioner may not rely on the Guidelines and must instead present testimony from a vocational expert to support a determination of no disability."  **Id.**; accord **Baker v. Barnhart**, 457 F.3d 882, 894-95 (8th Cir. 2006).  Nonexertional limitations "affect only [a claimant's] ability to meet the demands of jobs other than the strength demands[.]"  20 C.F.R. §§ 404.1569a(c)(1), 416.969a(c)(1).  Examples of such limitations include nervousness, anxiety, depression, difficulty performing postural functions such as stooping and reaching. 20 C.F.R. §§ 404.1569a(c)(1)(i), (vi); 416.969a(c)(1)(i), (iv).  If, however, the

nonexertional limitations "'do[ ] not diminish or significantly limit the claimant's residual functional capacity to perform the full range of Guideline-listed activities,'" "the Guidelines may still be used." **Baker**, 457 F.3d at 894 (quoting Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005)); accord **Draper v. Barnhart**, 425 F.3d 1127, 1132 (8th Cir. 2005); **McGeorge v. Barnhart**, 321 F.3d 766, 768-69 (8th Cir. 2003).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937. "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (internal quotations omitted). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently," **Strongson**, 361 F.3d at 1070. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000).

**Discussion**

Plaintiff first argues that the ALJ erred by concluding that he retained the RFC to perform light work; specifically, the ALJ erred by not giving the proper weight to Dr. Mahadevan's opinion – an opinion that was supported by evidence of Plaintiff's subsequent surgery and finding of disability and by other medical evidence in the record. Plaintiff next argues that the ALJ improperly assessed his credibility and, third, that he erred by relying on the Medical-Vocational Guidelines and not eliciting testimony by a vocational expert.

The Commissioner disagrees.

<u>Plaintiff's Residual Functional Capacity.</u> "The [social security] regulations provide that a treating physician's opinion . . . will be granted 'controlling weight' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" **Holmstrom v. Massanari**, 270 F.3d 715, 720 (8th Cir. 2001) (quoting <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1012-13 (8th Cir. 2000)) (alteration in original); <u>accord</u> **Cox v. Barnhart**, 471 F.3d 902, 907 (8th Cir. 2006); **Goff v. Barnhart**, 421 F.3d 785, 790 (8th Cir. 2005). The longer a claimant's health care provider has treated him and the more times, the more weight is given to that provider's opinion. 20 C.F.R. §§ 404.1527(d)(2)(i), 416.927(d)(2)(i). And, the more knowledge a physician has about the claimant's impairments, the more weight given to that physician's medical opinion. 20 C.F.R. §§ 404.1527(d)(2)(ii), 416.927(d)(2)(i). The treatment provided and the "kinds and extent of examinations and testing the [physician] performed or ordered from specialists and independent laboratories " are relevant to the

weight to be given the treating physician's opinion. Id. "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight . . . will [be] give[n] that opinion." 20 C.F.R. §§ 404.1527(d)(2)(iii), 416.927(d)(2)(iii). "[T]he more consistent an opinion is with the record as a whole, the more weight . . . will [be] give[n] that opinion." 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4). And, more weight is generally given "to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. §§ 404.1527(d)(5), 416.927(d)(5).

Dr. Mahadevan's records of Plaintiff's treatment consist of office notes that report Plaintiff's complaints of pain, measurements of his blood pressure, and prescriptions. There are no medical signs, for instance tenderness on palpation or ability to flex, and no laboratory findings. Instead, Dr. Mahadevan's assessment of Plaintiff's condition is apparently based primarily on Plaintiff's complaints. See **Brown v. Chater**, 87 F.3d 963, 964 (8th Cir. 1996) (permitting ALJ to discount health care provider's statement as to claimant's limitations because such conclusion apparently rested solely on claimant's complaints); **Woolf v. Shalala**, 3 F.3d 1210, 1214 (8th Cir. 1993) (finding that ALJ could discount conclusory statement of disability based on claimant's subjective complaints). Moreover, there is no indication in the record of Dr. Mahadevan's speciality and his conclusory assessment of Plaintiff's ability to perform work conflicts with the opinions in the record by specialists who restricted Plaintiff only from performing laborer's work. "[A] treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement."

**Hamilton v. Astrue**, 518 F.3d 607, 610 (8th Cir. 2008).  See also **Casey v. Astrue**, 503 F.3d 687, 693 (8th Cir. 2007) (finding that "ALJ acted within the acceptable zone of choice" when declining to give treating physician's RFC assessment controlling weight; treatment visits were infrequent and less than expected given claimant's allegations and opinion was not supported by any clinical or laboratory diagnostic data); **Randolph v. Barnhart**, 386 F.3d 835, 839 (8th Cir. 2004) (finding that ALJ had not erred by discrediting opinions and findings of claimant's treating physician; treating physician completed checklist that mirrored mental impairment's listing, her treatment notes did not indicate she had sufficient knowledge on which to base her conclusion that claimant could not work, and she never asked claimant about his abilities to function in areas that she concluded he could not); **Strongson**, 361 F.3d at 1071 (holding that it was reasonable for ALJ to give little probative value to treating physician's conclusory statement that claimant was vocationally impaired when such statement was without explanation and was not consistent with physician's treatment notes); **Hensley v. Barnhart**, 352 F.3d 353, 356 (8th Cir. 2003) (finding that ALJ properly discounted treating physicians' RFC determination; the opinions conflicted with that given by a specialist and the specialist's opinions were consistent with evidence).

Nor does Plaintiff's subsequent surgery retroactively give weight to Dr. Mahadevan's 2001 conclusory opinion.  This surgery was considered in the context of Plaintiff's September 2002 applications alleging a disability as of March 17, 2002.  The worsening of Plaintiff's back condition after the first adverse decision in the instant case does not lessen

the substantial evidence on the record as a whole, summarized and analyzed above, that supports that decision.

Plaintiff's Credibility. The ALJ noted in his second decision that the subjective complaints by Plaintiff in the second hearing were consistent with those in the first. The ALJ found those first complaints to be not fully credible. Plaintiff unsuccessfully challenged that finding in his earlier action. The Court found the challenge unavailing:

> The ALJ properly noted the lack of an objective medical basis to support those complaints. See **Stephens v. Shalala**, 50 F.3d 538, 541 (8th Cir. 1995) (lack of objective findings to support pain is strong evidence of lack of a severe impairment); **Barrett v. Shalala**, 38 F.3d 1019, 1022 (8th Cir. 1994) (holding that the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints); **Russell v. Sullivan**, 950 F.2d 542, 545 (8th Cir. 1991) (same). The ALJ also properly considered Plaintiff's sporadic and spare work history as a detractor from his credibility. See **Hutton v. Apfel**, 175 F.3d 651, 655 (8th Cir. 1999); **Woolf**, 3 F.3d at 1213. See also **Comstock v. Chater**, 91 F.3d 1143, 1147 (8th Cir. 1996) (claimant's credibility weakened by work history characterized by low earnings and significant breaks in employment); **Siemers v. Shalala**, 47 F.3d 299, 301 (8th Cir. 1995) (subjective complaints of pain properly discounted where, inter alia, claimant had unimpressive work history).
>
> Additionally, Plaintiff's failure to follow the prescribed regimen of physical therapy detracts from his claims of disabling impairments. See **Rose v. Apfel**, 181 F.3d 943, 944 (8th Cir. 1999) (diabetes controlled by medication was not disabling impairment); **Wilson v. Chater**, 76 F.3d 238, 241 (8th Cir. 1996) (finding that only impairments supported by medical record were controllable by diet or medication and therefore were not disabling).
>
> And, there are inconsistencies in the record noted by the ALJ and several physicians. For instance, Plaintiff's complaints of pain were regularly noted by the health care providers who observed him to be inconsistent with his actual performance on various tasks and with his affect. When he exerted effort during the physical therapy sessions, his pain improved. Although

Plaintiff described to various physicians an extremely sedentary life style, his muscle tone was normal.

Hudson, No. 4:02cv1286 at 31-32.

Having carefully reviewed Plaintiff's renewed arguments, the Court finds no basis on which to disturb its earlier conclusions.

Vocational Expert.  Plaintiff next argues that the ALJ improperly failed to elicit testimony by a vocational expert ("VE").  The merit of this argument is tied in part to Plaintiff's contention that the ALJ erred by not giving Dr. Mahadevan's opinion that he was significantly limited in his ability to balance, stoop, kneel, or crawl controlling weight and by not finding his subjective complaints more credible.  As discussed above, this argument is without merit.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted). Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  15th  day of September, 2008.